O

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>APARTMENTS AMERICA, LLC; MICHAEL J. STEWART; JOHN J. PACKARD; and RANDALL A. SMITH,<br><br>Defendants. | Case No.: SA CV 12-0754 DOC (ANx)<br><br>**ORDER ON MOTION TO IMPOSE CIVIL PENALTIES AND FOR ENTRY OF FINAL JUDGMENTS (DKT. 34)** |

Before the Court is a Motion to Impose Civil Penalties and for Entry of Final Judgments (Dkt. 34) brought by Plaintiff, the Securities and Exchange Commission ("SEC"). The SEC brought allegations of (1) the unregistered offer of securities in violation of Section 5(c) of the Securities Act, 15 U.S.C. § 77e(c), and (2) fraud in the offer or sale of securities in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3), against all Defendants in this case. The allegations stem from Defendants' actions in offering to sell unregistered securities in Apartments America to the public. These efforts were alleged to begun

in January 2010 and ended in March 2012. On March 27, 2013, the Parties submitted stipulations for judgment for a permanent injunction against all Defendants from violating sections 5 and 17 of the Securities Act. *See* Stipulations for Judgment (Dkts. 25-28). This Court entered judgment on those stipulations that same day (Dkts. 30-33), and set a hearing for May 21, 2013. As agreed to by the Parties, the remaining issue is whether to impose any civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d). *See* Dkts. 31-33 at 3-4. The SEC brings this Motion against only the individual defendants, Michael J. Stewart ("Stewart"), John J. Packard ("Packard"), and Randall A. Smith ("Smith"). For the reasons below, the Court will impose second-tier penalties for each defendant of $75,000, under 15 U.S.C. § 77t(d)(2)(C).

**I.     Factual Background**

**a.  Allegations of the Complaint are Deemed True**

Part of the Parties' settlement stipulation is an agreement that, for the purpose of imposing a penalty, Defendants will not argue that they did not violate securities laws as alleged. *See, e.g.*, Dkt. 226 at ¶ 4. Thus Defendants agreed that the allegations of the Complaint (Dkt. 1) are accepted as true for this Motion, and the Court can make its determination on the basis of "affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." *Id.*

**b.  The Underlying Facts**

Before forming Apartments America, Stewart and Packard owned Pacific Property Assets ("PPA"), which sold "secured promissory notes" to investors and used the proceeds to invest primarily in apartment buildings in Southern California and Arizona.[1] Compl. ¶ 13. Smith worked at PPA beginning in April 2009. *Id.*

In May 2009, PPA defaulted on $91.6 million in promissory notes held by 647 investors in 37 investment programs. *Id.* ¶ 14. In the months prior to default, PPA had actively solicited

---

[1] Defendants Stewart and Packard have now been indicted on counts of mail fraud, bank fraud, and bankruptcy fraud, in connection with PPA. *See United States v. Stewart et al.*, 8:14-cr-0014-CJC (C.D. Cal. Jan. 15, 2004).

investor funds, and was promising an annual interest rate of 24% to 30% on its promissory notes. *Id.* In June 2009, one month after its default, PPA filed for Chapter 11 bankruptcy. *Id.* This bankruptcy was converted to Chapter 7 in September 2010. *Id.* The Bankruptcy Trustee took over all management of PPA's property portfolio in April 2010. *Id.* ¶ 15. According to the bankruptcy filings, defendants Stewart and Packard drew substantial salaries paid from PPA assets until the default. *See id.* In September 2009, three months after PPA filed for bankruptcy, Stewart, Packard, and Smith formed Apartments America. *Id.* ¶ 16. They agreed to resume the same business model that they had employed with PPA—raise funds from investors and pool the proceeds to purchase apartment buildings in Southern California and Arizona. *Id*.

To raise funds from investors, Defendants schemed to defraud potential investors by: (1) offering unregistered securities; and (2) making material misrepresentations and omissions to potential investors. *Id.* ¶ 17.

Beginning in January 2010 until at least March 2012, Defendants offered to sell unregistered securities in Apartments America to the public through a variety of methods including Apartment America's website and other solicitation materials. *Id.* ¶ 18. In their solicitation efforts, which included advertisements online and in the newspaper, cold-calling, and letters, Defendants repeatedly misrepresented Apartments America's business operations and track record, as well as omitted material information about PPA's bankruptcy in order to lure in investors. *Id.* ¶ 20. Defendants Packard, Stewart, and Smith prepared and/or reviewed Apartments America's internet website, solicitation letters, business plan, investment proposal, and track record chart, before they were publicized to potential investors. *Id*. ¶ 19.

Apartments America's internet website included a page titled "Current Offerings," later changed to "Target Properties in Due Diligence," that identified six properties in California and Arizona, along with a target acquisition price, equity requirement, and target exit price. *Id.* The equity requirements for the properties ranged from $450,000 to $3 million, and the total equity required for all six properties totaled approximately $12.5 million. *Id*.

From about January 2010 through March 2012, defendants solicited potential investors using the company's publicly-accessible website, www.apartmentsamerica.us. *Id.* ¶ 21. As of

January 2010, the home page of the website included the tag line: "Improving communities for over a decade," and promised "extraordinary returns for our investors and partners." *Id.* The website disclosed the following information:

- On the "Company Overview" page, defendants stated that Apartment America's team was responsible for the "creation of more than $100 million in net equity growth." *Id.*
- On a page titled "2000 -2008 Track Record Chart – Return on Equity," defendants listed transactions involving 39 properties, and totaled the column headed "Annual ROE Before Fees" to state "63.43%." *See id.*
- On a page titled "Investment Objectives," defendants stated, "[t]he principals of Apartments America currently have an equity stake in and oversee a multi-family portfolio of more than $200 million." *See id.*
- On the "Investor Q&A" page, under the heading "Historical Results," defendants stated, "[a] review of our Track Record covering projects acquired in Arizona and California confirms that in general Apartments America has experienced average annual profit returns of 63% or more on invested equity." *Id.* In or about June 2010, the "Track Record" page was corrected to read, "1999-2005 Average ROE* = 63.43%." *Id.* ¶ 22.

In July 2010, defendants disclosed some information on Apartments America website about the PPA bankruptcy. The website's disclosures had the following:

- On the "Company overview" page, defendants still claimed to be responsible for "the creation of more than $100 million in net equity growth." See id., ¶ 23.
- A page titled "Previous Investments" directed visitors to the "Track Record" page, which still listed 39 transactions but now stated, "1996-2008 Average ROE* = 63.43%." *Id.* A note on the Track Record page stated that the calculation "excludes properties still under management by a predecessor entity Pacific Property Assets in 2009, when fallout from the banking and credit crisis resulted in numerous properties being placed under voluntary bankruptcy protection." *Id.*

1
2
3
- The "Investment Objectives" page continued to state that "[t]he principals of Apartments America currently have an equity stake in and oversee a multi-family portfolio of more than $200 million." *Id.*

4
5
6
7
8
9
10
11
- On the "Investor Q&A" page, under the heading "Historical Results," defendants stated "[a] review of the Track Record of our management's prior ventures covering projects acquired in Arizona and California confirms that during the period 1996-2008, the principals of AA acquired, renovated and resold a total of 40 apartment complexes for an average gross annual return on investment of over 60%. *Id.* Many of the properties still under management in 2009 by a predecessor entity Pacific Property Assets were placed in voluntary bankruptcy proceedings due to fallout from the financial and banking crisis." *Id.*

Apartments America's website appears to have been removed from the Internet on March 28, 2012. *Id.* ¶ 27. Stewart directed an Apartments America employee to prepare website advertisements, and Stewart provided the employee with information about Apartment America's track record and equity created by its principals. *Id.* One of the website advertisements stated that Apartments America was "looking for equity or debt investors for individual transactions," and that "[t]his proven team created $100 million in net equity growth during an eight-year period through the acquisition of value-add multifamily properties." *Id*. The advertisement further stated, "[t]his proven team has successfully acquired and renovated nearly 100 individual assets with those sold to third parties yielding an average ROI of 63% PER ANNUM" (emphasis in original). *Id.* The website advertisement was generally available to the public at least from November 16, 2010. *Id*. ¶¶ 24, 26. Neither of two Internet advertisements detailed in the Complaint disclosed Defendants' prior association with PPA or PPA's bankruptcy. *Id.* ¶ 25.

Defendants sent one letter dated May 26, 2010 to approximately 700 individuals who allegedly had previously contacted PPA. *Id.* This letter, on Apartments America letterhead, was signed by defendant Smith. *Id.* It mentioned that "PPA Real Estate" was a predecessor company to Apartments America, but did not disclose PPA's bankruptcy. *Id.* In that letter, defendants

stated: "In just the past decade, the principals of Apartments America have collectively acquired and renovated more than 3,000 apartment units in these markets. *Id.* Even better, between 2001 and 2008 alone, 40 portfolio properties were sold in arms-length transactions that produced an average annualized return on investment of over 60%." *Id.*

### c. Misrepresentations and Omissions

Defendants made false and misleading representations and concealed material information as part of a fraudulent scheme to create the illusion that Apartments America was a sound and lucrative investment. *Id.* ¶ 32. Defendants engaged in this scheme to mislead prospective investors into investing in Apartments America when, in fact, neither Apartments America nor the individual defendants could substantiate their claims, and Apartments America was not the safe and sound investment portrayed by defendants. *Id.*

Defendants repeatedly stated that Apartments America and/or its principals have a track record of over a 60% average annualized return on equity. *Id.* ¶ 33. While the specific wording and time frame varied slightly among Apartments America's website, the website advertisements, and letters to investors, defendants consistently represented that their "Track Record" showed that they had produced an annual return in excess of 60%. *Id.* Defendants' representations that Apartments America or the individual Defendants had a "track record" of providing a "60%" (or better) average annual return were materially false and misleading for several reasons. *Id.* ¶ 34. Apartments America never purchased or sold any real estate, and did not have a track record at all. *Id.* Accordingly, the statement that appeared on Apartments America's website, from January 2010 through at least June 2010, representing "that in general Apartments America has experienced average annual profit returns of 63% or more on invested equity" lacked any factual basis. *Id.* In or about July 2010, Defendants modified the website to claim "an average gross annual return on investment of over 60%" from 40 apartment complexes; however, this statement was also misleading because it omitted material information about losses on bankrupt properties. *Id.*

Stewart, Packard, and Smith also did not have a track record of producing 60% annual returns. *Id.*¶ 35. This claim was materially misleading because defendants deliberately excluded

from this calculation the losses incurred on the approximately 50 properties that PPA owned when it declared bankruptcy, which would have substantially lowered, if not entirely wiped-out, defendants' claimed 60% average annual return. *Id.* Defendants omitted material information about these remaining 50 properties and the impact that the losses on these properties would have on the calculation of any average annual returns. *Id.*

Defendants repeatedly stated that Apartments America's principals created more than "$100 million in net equity." *Id.* ¶ 36. While the time frame for this representation varied, defendants consistently made this representation in solicitations to investors. *Id.* Defendants' representation that Apartments America's principals created more than "$100 million in net equity" was materially false and misleading because defendants omitted material information from their calculation about the losses incurred from, and the lack of equity in, the approximately 50 properties that PPA owned when it declared bankruptcy in 2009. *Id.* ¶ 37. Defendants' claim was false and misleading because PPA's bankruptcy erased any "equity" that PPA had accumulated, and it was misleading to claim to have created equity without disclosing that all such equity had been wiped out by PPA's bankruptcy. *Id.*

From about April 2010 to about October or November 2011, defendants stated on Apartments America's website that the "principals of Apartments America currently have an equity stake in and oversee a multi-family portfolio of more than $200 million." *Id.* ¶ 39. This representation was materially false and misleading because after April 2010, the principals of Apartments America were not overseeing any such property portfolio. *Id.* The $200 million property portfolio that was the purported basis for that statement was PPA's portfolio. *See id.* In fact, in April 2010, Stewart and Packard were replaced by the Bankruptcy Trustee who oversaw PPA and its property portfolio. *See id.* Defendants did not disclose that the $200 million property portfolio that was their basis for this representation was PPA's property portfolio, that PPA had declared bankruptcy, or that as of April 2010, defendants had been replaced by the Bankruptcy Trustee. *Id.* ¶ 40. Starting in July 2010, Apartments America's website disclosed PPA's bankruptcy — but this disclosure appeared on a different page of the website than the page on which the company represented its management of a large property portfolio, and

defendants continued to represent that they had management authority over this portfolio although there was no basis in fact for such a representation because they had been replaced by the Bankruptcy Trustee. *Id.*

Even though Stewart, Packard, and Smith each knew that the representation concerning the management of a $200 million property portfolio was false, defendants did not remove this representation from Apartments America's website until October or November 2011. *Id.* ¶ 41.

Defendants failed to disclose PPA's bankruptcy on Apartments America's website from at least January 2010 through June 2010. *Id.* ¶ 42. In or about July 2010, defendants disclosed PPA's bankruptcy on Apartments America's website. *See id.* In or about July 2010, Apartments America's website, including the track record chart on the website, disclosed that numerous PPA properties were placed in voluntary bankruptcy in 2009. *Id.* This disclosure, however, did not clarify that the 60% (or better) annual return on equity number was calculated using some of PPA's properties, and that the annual return on equity amount would be substantially lower, if not entirely wiped out, if PPA's approximately 50 bankrupt properties were included in the calculation. *Id.* While defendants disclosed PPA's bankruptcy in the August 11, 2010 solicitation letter sent to PPA investors, defendants failed to disclose PPA's bankruptcy, and its effect on many of their claims, in the website advertisements/postings, business plan, investment proposal, "Track Record" chart, and May 26, 2010 solicitation letter to potential investors. *Id.* PPA's bankruptcy, and defendants' role as managers of PPA when it declared bankruptcy, was material information to investors. *Id.* ¶ 43. Information about PPA's bankrupt property portfolio was material information to investors, because including that information had a material effect on the results being touted by defendants in their solicitation efforts for Apartments America. *Id.*

### d. Scienter Based on Admitted Allegations

Defendants Stewart, Packard, and Smith admit for the purposes of this motion that they acted with scienter. *Id.* ¶ 44. Defendants Stewart, Packard, and Smith knew, or were reckless in not knowing, that by cherry-picking certain information from PPA's history to arrive at a purported annual return and creation of equity, defendants were materially misrepresenting their

-8-

track record and performance history. *Id.* ¶ 45. Defendants Stewart, Packard, and Smith engaged in a concerted scheme to distance themselves from PPA and its bankruptcy, while selectively using some of PPA's historic investments to tout their real estate expertise. *Id.* Defendants Stewart, Packard, and Smith knew, or were reckless in not knowing, that their failure to disclose PPA's bankruptcy and its effect on their so-called track record was materially misleading. *Id.*

## II.   Legal Standard

The SEC seeks third-tier penalties in the amount of $150,000 per individual Defendant. 15 U.S.C. § 77t(d)(2)(C). This penalty is available as an alternative to a fine for the gross amount of a defendant's financial gain from his violation of the relevant securities laws. *See id.* Two conditions must be met for this penalty, the highest category under the statute: (1) the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and (2) it "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Other options for the Court include no penalty, first-tier penalties of $7,500 available for any violation of the Securities Act, and second-tier penalties of $75,000. *See id.* § 77t(d)(2)(C); 17 C.F.R. § 201.1004 (SEC rule setting adjustment in penalties for inflation). The second-tier requires showing the violation "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement," but there is no requirement to show substantial losses or risk of substantial losses to others.

### a.   Factors in considering a penalty

The point of civil penalties is to punish and deter violations of the securities laws and thus protect (1) investor confidence, (2) financial market efficiency, and (3) the stability of the securities industry. *U.S. S.E.C. v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) *aff'd,* 438 F. App'x 23 (2d Cir. 2011) (citations omitted). Courts frequently consider factors set forth in *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Circuit) when deciding on an appropriate penalty for violations of the Securities Act. Those factors are: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his

assurances against future violations. *Id.* Other considerations include (6) whether a defendant's conduct created substantial losses or the risk of substantial losses to others; (7) a defendant's lack of cooperation with authorities; and (8) whether the penalty that otherwise would be appropriate should be reduced due to a defendant's demonstrated current and future financial condition. *S.E.C. v. Cavanaugh,* 2004 U.S. Dist. LEXIS 13372 at *103-104 (S.D.N.Y. July 16, 2004).

### III. Analysis

As to scienter, the SEC notes that Defendants began their scheme a mere three months after PPA filed for bankruptcy, and that they then targeted both new investors and former PPA investors. Mot. at 15. Defendants have admitted selective disclosures about PPA, including false representations that they created $100 million in net equity, were overseeing a $200 million portfolio, and that they had achieved better than a 60 percent average annualized return on equity. All are misleading, by admission of all the defendants, because they omit the bankruptcy, properties from PPA that lost money, and the fact that the Bankruptcy Trustee oversaw PPA's portfolio.

Defendants' main argument on scienter is that they relied in good faith on advice from attorneys from Lebrecht Group ("Lebrecht") about, for example, whether their website was a public offering of securities. Ds' Opp'n at 21, & at 10 (citing Stewart Decl. ¶¶ 28-31, Exs. 3-4, Lebrecht Decl. ¶¶ 8-11, Butler Decl. ¶¶ 7-9, Exs. 1-2); Smith Decl. at 2; Smith Opp'n .[2] Attorneys for Apartments America's attorneys state in declarations that the Defendants made changes to clarify website and other disclosures, and that these defendants "never indicated to them any intent of not following any instructions to make the [Apartments America] website accurate in nature." Ds' Opp'n at 11.

The problem with Defendants' argument is, first, that their argument about the propriety of the website deals with the Section 5(c) violation, which is a strict liability statute. Second, a

---

[2] Defendants' Opp'n refers to the Opposition Memorandum filed on behalf of Apartments America, Packard, and Stewart (Dkt. 39). Smith filed a separate Opposition Memorandum (Dkt. 36) ("Smith Opp'n").

reliance on counsel defense requires a showing that defendants "(1) made complete disclosure to counsel, (2) requested counsel's advice as to the legality of the contemplated action, (3) received advice that it was legal, and (4) relied in good faith on that advice." *See SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. 1985). Other than one e-mail attachment with some figures related to the return on equity, Ds' Opp'n at 22; Dkt. 42, Ex.3, Defendants do not set out evidence for a full disclosure to counsel, such as the underlying facts to their claims, or calculations for certain equity numbers. Further, in depositions, counsel for Apartments America made no claim that they confirmed the accuracy of the alleged misrepresentations in this case. *See* Puathasnanon Decl. (Dkt. 34-5, 60:18-73:24; Dkt. 34-6, 39:3-16, 63:6-67:23; 104:7-106:9). This claimed defense requires precision in what defendants told their lawyers, what advice their lawyers gave about legality of specific representations, and subsequent reliance on that specific advice blessing a particular representation. *See Goldfield Deep Mines Co.*, 758 F.2d at 467. Defendants simply have not made this showing. Assertions that defendants did rely on Lebrecht's counsel "on just about [e]very aspect" of Apartment America's business, Ds' Opp'n at 22, are vague and were not substantiated by testimony at the hearing that defendants sought and received advice on the specific misrepresentations at issue in this case before making those misrepresentations.

The evidence on whether the infractions were recurring does not weigh strongly in favor of second or third-tier penalties. Beyond the website's misrepresentations, the other acts of misrepresentation are concentrated over a few months in 2010. *See* Mot. at 16. The third factor, recognition of the wrongful nature of each defendant's conduct, does weigh in favor of second or third-tier penalties. Smith argues that "there are no allegations that Smith knew that his activity violated any law," Smith Opp'n at 3, while Packard and Stewart argue that they stipulated to end their case "to avoid future expense and also recognize that they may have been erroneous in relying on the advice of LG, although they thought this was good advice." Ds' Opp'n at 23-24. According to Packard and Stewart, "[n]othing more is required." The Court does not find the above statements to show strong signs of recognizing the wrongful nature of each defendant's conduct, and this conclusion is unchanged by the testimony at the hearing.

1 Factors four and five are the likelihood of future violation based on defendants' line of
2 work, and the sincerity of assurances against future violations. It appears Defendants Smith and
3 Packard remain in real estate-related business, although struggling to make any business
4 transactions. Smith Decl. at 3; Puathasnanon Reply Decl. Ex. 4, 11-27.

5 Defendants' best argument for a lower penalty is that there is no evidence they made any
6 money from Apartments America, they never started on real estate projects, and took in no
7 revenues, much less any profit. Ds' Opp'n at 1. Despite a website running until March 2012,
8 internet, newspaper, cold-call and other solicitations, there is no indication Defendants received
9 much interest in their new business. *See* Ds' Opp'n at 22 n.27. This makes some sense, given
10 that their business was trying to rise from the ashes of the PPA flameout.

11 It does not appear that defendants meaningfully varied in how involved they were in
12 Apartments America. Stewart directed an employee to make misleading website advertisements,
13 Compl. ¶ 24, while Smith reviewed and approved postings on a social networking website, *Id.* ¶
14 25. Packard asked Stewart to run national advertisements, while Stewart direct some cold-
15 calling. *Id.* ¶¶ 28-29. Based on admitted allegations that are sufficiently common to all
16 individual defendants, the Court believes the same penalty should apply to all three.

17 At the hearing, there was considerable focus on whether defendants had in fact clarified
18 these misrepresentations prior to any contact with the SEC about the agency's investigation.
19 Upon review of the different available versions of the defendants' websites, Purpero Further
20 Decl. (Ex. 66, and accompanying exhibits 1-2, 4-5), the Court agrees with the SEC that
21 defendants did not meaningfully clarify the misrepresentations with, for example, their
22 additional text that "past program results do not necessarily provide an accurate indicator of
23 future program operations or expected results." (Ex. 4 to Purpero Further Decl., at 18-19). A
24 further statement added by the defendants that "[s]ome of the aforementioned transactions
25 involved properties in which cash distributions were suspended and/or reduced as a result of the
26 severe liquidity crisis in the banking industry," *id.*, does not identify the "aforementioned
27 transactions," nor does it qualify or explain the misleading claim of "average annual profit
28 returns of 63% or more" in past investments. In sum, defendants admitted as part of their

1  settlement with the SEC that they acted with scienter, and it is apparent that this admission is
2  amply supported by the record.
3      Because it does not appear Apartments America ever got off the ground, or that there was
4  serious risk of major public losses, this Court will not award third-tier damages. The deceitful
5  statements in this case, in light of all the circumstances, warrant a serious penalty, but not from
6  the highest tier possible under 15 U.S.C. 77t(d)(2).

### IV. Disposition

For the above reasons, the Court imposes second-tier penalties of $75,000 on individual defendants Stewart, Packard, and Smith.

DATED: March 3, 2014

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE